IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WILLIAM S. HARVEY,                    )
                                      )
       Plaintiff,                     )
                                      )
          vs.                         )    Civil Action No. 05-1218
                                      )
JO ANNE B. BARNHART,                  )
Commissioner of Social Security,      )
                                      )
       Defendant.                     )

MEMORANDUM OPINION

**I.    INTRODUCTION**

Pending before the Court are cross-motions for summary judgment filed by Plaintiff William S. Harvey and Defendant Jo Anne B. Barnhart, Commissioner of Social Security.   Plaintiff seeks review of final decisions by the Commissioner denying his claims for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.*[1]   Pursuant to the discussion which follows, Plaintiff's motion is granted, Defendant's motion is denied, and the matter is remanded to the

---

[1]   A person is eligible for supplemental security income benefits if he is "disabled" (as that term is defined elsewhere in the regulations) and his income and financial resources are below a certain level.   42 U.S.C. § 1382(a).   To be granted a period of disability and receive disability insurance benefits, a claimant must show that he contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he was last insured.   42 U.S.C. § 423(a).

Commissioner for calculation of benefits.

## II.   **BACKGROUND**

### A.   Factual Background

Plaintiff William S. Harvey was diagnosed in June 1994 with human immunodeficiency virus ("HIV.")  He was employed as an architectural designer and landscaper until December 2002, when he filed for Social Security benefits, claiming that the limitations associated with HIV, rotator cuff problems in his right shoulder, anxiety, and depression made it impossible for him to continue to work.  Soon thereafter, Mr. Harvey was diagnosed with sarcoidosis.[2]

### B.   Procedural Background

On April 21, 2003, Mr. Harvey protectively filed for disability insurance and supplemental security income benefits. (Certified Copy of Transcript of Proceedings before the Social Security Administration, "Tr.," Docket No. 6 at 58-60 and Docket No. 9 at 444-445, respectively.)[3]  Both applications were initially

---

[2]  Sarcoidosis is a disease in which abnormal inflammatory clusters of immune cells (macrophages, lymphocytes, and multinucleated giant cells) known as "granulomas" appear in the lymph nodes, liver, eyes, skin, or - most commonly - the lungs.  Although the cause is unknown, sarcoidosis may be related to hypersensitivity to environmental factors, genetics, or an extreme immune response to infection.  Sarcoidosis can be acute, subacute, or chronic.  Some cases (30% to 50%) will resolve without treatment in one to three years but severely affected patients may require treatment with corticosteroids and/or immunosuppressive agents for as long as one or two years.  About 20% of individuals whose lungs are affected will develop residual lung damage.  Death from sarcoidosis is rare.  *See* medical encyclopedia at www.nlm.nih.gov/medlineplus.

[3]  For reasons which are unclear to the Court, the certified transcript of this case was entered multiple times in the electronic docket.  The Court has relied on Docket No. 6 for Tr. 1-165; Docket

denied on September 23, 2003 (Tr. 6/38-41 and 9/447-500), after which Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ") on November 18, 2003.  (Tr. 6/42-45.)

On October 20, 2004, a hearing was held before the Honorable Kenneth R. Andrews at which Plaintiff was represented by counsel. Judge Andrews issued his decision on May 20, 2005, again denying DIB and SSI benefits.  (Tr. 6/14-26.)  The Social Security Appeals Council declined to review the ALJ's decision on July 14, 2005, finding no error of law or abuse of discretion and concluding the decision was based on substantial evidence to support his findings. (Tr. 6/9-11.)  Therefore, the May 20, 2005 opinion became the final decision of the Commissioner for purposes of review.  42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), citing Sims v. Apfel, 530 U.S. 103, 107 (2000).  Plaintiff filed suit in this Court on September 16, 2005, seeking judicial review of the ALJ's decision.

C.   Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the

No. 8 for Tr. 166-399; and Docket No. 9 for Tr. 400-500.  For convenience, we will indicate references to the transcript with both the docket and page number.

plaintiff resides.

## III. STANDARD OF REVIEW

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake de novo review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), citing Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is

4

supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. <u>Panetis v. Barnhart</u>, CA No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* <u>Simmonds v. Heckler</u>, 807 F.2d 54, 58 (3rd Cir. 1986), and <u>Sykes v. Apfel</u>, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV.  **LEGAL ANALYSIS**

### A.   The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income or disability insurance benefits, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[4] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be expected to last for not less than twelve months.  42 U.S.C. § 1382c(a)(3)(C)(i); <u>Morales v. Apfel</u>, 225 F.3d 310, 315-316 (3d Cir. 2000).

To determine a claimant's rights to either SSI or DIB,[5] the

---

[4]  According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities. . . . Work may be substantial even if it is done on a part-time basis."  "Gainful work activity" is the kind of work activity usually done for pay or profit.

[5]  The same test is used to determine disability for purposes of receiving either type of Social Security benefits.  <u>Burns v. Barnhart</u>, 312 F.3d 113, 119, n1 (3d Cir. 2002).  Therefore, courts routinely consider case law developed under both SSI and DIB applications.

ALJ conducts a formal five-step evaluation:

   (1)   if the claimant is working or doing substantial gainful
         activity, he cannot be considered disabled;

   (2)   if the claimant does not suffer from a severe impairment
         or combination of impairments that significantly limits
         his ability to do basic work activity, he is not
         disabled;

   (3)   if the claimant does suffer from a severe impairment
         which meets or equals criteria for an impairment listed
         in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the
         Listings") and the condition has lasted or is expected to
         last continually for at least twelve months, the claimant
         is considered disabled;

   (4)   if the claimant retains sufficient residual functional
         capacity[6] ("RFC") to perform his past relevant work, he
         is not disabled; and

   (5)   if, taking into account the claimant's RFC, age,
         education, and past work experience, the claimant can
         perform other work that exists in the local, regional or
         national economy, he is not disabled.

20 C.F.R. § 416.920(a)(4); see also Morales, 225 F.3d at 316.

     In steps one, two, and four, the burden is on the claimant to

present evidence to support his position that he is entitled to

Social Security benefits, while in the fifth step the burden shifts

to the Commissioner to show that the claimant is capable of

performing work which is available in the national economy.[7] Sykes

v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

_____

     [6] Briefly stated, residual functional capacity is the most a
claimant can do despite his recognized limitations.  20 C.F.R.
§ 416.945.

     [7] Step three involves a conclusive presumption based on the
listings, therefore, neither party bears the burden of proof at that
stage.  Sykes, 228 F.3d at 263, n2, citing Bowen v. Yuckert, 482 U.S.
137, 146-147 n5 (1987).

Following the prescribed analysis, Judge Andrews first concluded that Mr. Harvey had not engaged in substantial gainful employment since alleging disability on December 15, 2002. (Tr. 6/18.) Resolving step two in Plaintiff's favor, the ALJ found that he suffered from sarcoidosis, right rotator cuff syndrome, anxiety and depression, all of which the ALJ determined were "severe" as that term is defined in the Social Security regulations. He further determined that although Mr. Harvey had been diagnosed as HIV positive, there were no impairments related to that disease which would limit his ability to sustain activity on a regular and continuing basis; therefore, he concluded that the HIV infection was not severe. (Id.)

At step three, the ALJ concluded that Plaintiff's impairments, taken alone or in combination, did not satisfy any of the criteria in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically Listings 1.00 Musculoskeletal System, 3.00 Respiratory System, 14.00 Immune System, 12.04 Affective Disorders, and 12.06 Anxiety-Related Disorders. (Tr. 6/18-19.) At step four, the ALJ concluded that based on the medical evidence of record, Mr. Harvey did not retain the RFC to perform his previous work as an architectural designer which the vocational expert ("VE") at the hearing, Leon L. Reid, classified as skilled sedentary work, nor his previous work as a landscaper, which Mr. Reid described as unskilled, heavy work activity. (Tr. 6/23.)

In response to one of the ALJ's hypothetical questions, Mr. Reid stated that there were numerous semi-skilled, low-stress, sedentary jobs such as information clerk, mailing list compiler, and invoice clerk which an individual of Mr. Harvey's age, education, and physical/mental limitations could perform in the local or national economy. (Tr. 6/24.) Therefore, based on Plaintiff's status as a younger individual[8] with two years of education beyond the high school level, a work history of skilled and unskilled occupations which did not provide transferrable skills, and the medical evidence of record, the ALJ determined at step five that Mr. Harvey was not disabled and, consequently, not entitled to benefits. (Id.)

B.   Plaintiff's Arguments

        Plaintiff offers three arguments why the decision of the ALJ should be reversed and benefits granted without further review. First, he argues the ALJ erred at step two of his analysis by concluding that his HIV infection was not a severe impairment. (Plaintiff's Brief in Support of a Motion for Summary Judgment, Docket No. 20, "Plf.'s Brief," at 11-19.) Next, he argues that the decision was not supported by substantial evidence because the ALJ failed to properly evaluate Plaintiff's consistent complaints of fatigue. (Id. at 19-22.) Finally, Mr. Harvey argues the ALJ's

_____

        [8] Plaintiff was 44 years old at his alleged disability onset date and 47 at the time of the hearing, making him a "younger" person according to Social Security regulations. 20 C.F.R. § 404.1563(c) and § 416.963(c).

8

finding that he retained the residual functional capacity to perform a modified range of sedentary work is not supported by substantial evidence. (Id. at 23-26.) We address each of those arguments in turn.

1. *The ALJ's conclusion that Plaintiff's HIV infection was not a severe impairment:* In support of his argument that Judge Andrews erred by concluding his HIV infection was not a severe impairment, Plaintiff contends that the ALJ improperly rejected or overlooked evidence of worsening fatigue, increased difficulty performing most activities of daily living, chronic joint pain, vertigo, and memory lapses. (Plf.'s Brief at 16-17.) He also argues that the ALJ confused "asymptomatic" with "non-existent" with regard to the fatigue problems associated with HIV infections. (Id. at 18.) The fact that his work and social activities have all significantly declined due to fatigue demonstrates that his HIV infection has more than a slight effect on his abilities and activities, and should therefore be considered "severe" as the term is defined by the Social Security Administration. (Id. at 18-19.)

In response, Defendant argues that the ALJ properly determined Plaintiff's HIV was non-severe because (1) it did not cause any functional limitations and (2) the ALJ's RFC analysis accommodated all limitations related to his status as HIV positive. (Defendant's Brief in Support of Her Motion for Summary Judgment, Docket No. 22, "Def.'s Brief," at 12-13.)

At step two of his analysis, the ALJ first concluded, as noted above, that Plaintiff's sarcoidosis, right rotator cuff syndrome, depression, and anxiety were all severe impairments. He further concluded:

> The claimant has no limitations relating to HIV infection. Progress notes from Sharon Riddler, M.D., claimant's treating physician, lists [sic] asymptomatic HIV infection status (Exhibits 14F, 15F, 18F, 19F). In a report dated January 21, 2004, Dr. Riddler indicated that the claimant has been under her care for HIV infection since June of 1994 and that over the past nine years, the claimant's lab work has remained relatively stable. There is no corroboration in the record to show that the HIV infection has limited the claimant's ability to sustain activity on a regular and continuing basis. From the evidence, it is clear that the HIV infection is not a severe impairment. In any event, the residual functional capacity adopted here and discussed below limits the claimant to sedentary exertion, which should accommodate any shortcoming in this area.

(Tr. 6/18.)

Throughout his decision, the ALJ made other references to Plaintiff's HIV infection. For example, hospital records from February 2003 when Plaintiff was hospitalized with chest pain and shortness of breath showed that the "CD4 count was normal and viral load was undetectable." (Tr. 6/20.) Similar references to "asymptomatic HIV infection" and Mr. Harvey's "stable" condition appear in the transcript at Tr. 6/19, 6/21 and 6/23.

These multiple references to Plaintiff's HIV infection undercut Mr. Harvey's contention that the ALJ confused "asymptomatic" with "non-existent." Moreover, as discussed below, the ALJ did not reject or overlook evidence related to fatigue,

10

increased difficulty performing most activities of daily living, chronic joint pain, vertigo, and memory lapses; instead, he attributed those limitations to – and discussed them in the context of – Plaintiff's sarcoidosis.

In the case of a claimant suffering from a chronic disease such as HIV, it is not enough to show the presence of the disease; rather the claimant must show that the severity of his disease precludes him from engaging in any substantial gainful activity. Alexander v. Shalala, 927 F.Supp. 785, 792 (D. N.J. 1995); Walker v. Barnhart, No. 05-2282, 2006 U.S. App. LEXIS 5719, *8 (3d Cir. Mar. 6, 2006). Plaintiff does not identify any symptoms associated with a diagnosis of HIV which were not considered by the ALJ, albeit in a different context. While we agree that the ALJ erred in his decision regarding Plaintiff's ability to perform substantial gainful employment, we do not find any error associated with this portion of his decision.

2. *The ALJ's failure to properly evaluate Plaintiff's consistent complaints of fatigue:* Mr. Harvey points out that even those tasks which he was intermittently able to do require much longer time to complete due to fatigue, pain and depression. He has given up many of his past activities for the same reasons. Plaintiff argues the ALJ erred by failing to sufficiently take into consideration his constant complaints of fatigue, and compounded the error by emphasizing what Plaintiff was able to do while not

11

considering what he was unable to do.  (Plf.'s Brief at 22.)

While the ALJ made several passing references to Plaintiff's claims of fatigue,[9] his decision that Mr. Harvey's pain, fatigue and other subjective complaints were not incapacitating appears to be based primarily on two items of information.  First, he discussed a letter dated January 21, 2004, from Dr. Sharon Riddler who treated Plaintiff for both HIV and sarcoidosis.  The ALJ gave only "limited weight" to Dr. Riddler's opinion that Mr. Harvey was unable to work due to incapacitating symptoms.  (Tr. 6/21.) Second, he found Mr. Harvey's allegations at the hearing and in his activities of daily living questionnaire that he could not work due to chest pain, joint pain and fatigue were not "fully credible because the objective medical findings and opinions of record, to the extent they are consistent with those findings, do not rule out sedentary work."  (Tr. 6/23.)  In short, the ALJ concluded that "the evidence of chronic fatigue and joint pain is weak, but I have

_____

[9] See, e.g., the discussion of Plaintiff's depression and anxiety disorders where the ALJ noted a "mild impairment of concentration, persistence, and pace" which he associated in part with fatigue.  While the ALJ concluded that fatigue affected his work pace, it did not rule out low stress, sedentary tasks.  (Tr. 6/19.) Second, the ALJ noted the report of Richard Marshall, a therapist who began treating Mr. Harvey for anxiety, fatigue and depression following his diagnosis as HIV positive.  (Tr. 6/21-22.)  The ALJ concluded that Mr. Marshall's reservations about Plaintiff's ability to "hold any sort of job" could be accommodated by limiting Plaintiff to jobs performed in a low-stress environment.  (Id. at 6/22.)  Third, he acknowledged that Dr. Dauber, the pulmonary specialist who diagnosed Mr. Harvey's sarcoidosis, had noted Plaintiff's complaints of dizziness, fatigue, cough, shortness of breath, and vertigo (see Tr. 8/354-355, 374-396), but stated no opinion as to the weight assigned, if any, to Dr. Dauber's medical findings.

12

construed it in the claimant's favor and accommodated these shortcomings in the RFC adopted here."   (Tr. 6/21.)   Defendant argues that by construing this "weak" evidence in Plaintiff's favor and limiting him to sedentary work, the ALJ adequately accommodated his subjective complaints. (Def.'s Brief at 14.)

Social Security regulations clearly describe how the ALJ is to weigh a claimant's subjective complaints of pain, fatigue, shortness of breath, weakness, or nervousness and assess the claimant's credibility with regard to those complaints. *See* Social Security Ruling ("SSR") 96-7p, "Evaluation of Systems in Disability Claims: Assessing the Credibility of an Individual's Statements."[10] In brief, a claimant's description of his physical or mental symptoms is not sufficient in itself to establish disability. Rather, the ALJ must first ascertain if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the pain or other symptoms. Once such a medically determined condition is identified, the ALJ must evaluate the intensity, persistence, and effects of the claimed symptoms to determine the extent to which they limit the individual's ability to do basic work activities.   In this second

---

[10] "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'" Sykes, 228 F.3d at 271, *citing* 20 C.F.R. § 402.35(b)(1). "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same." Sykes, id., *quoting* Heckler v. Edwards, 465 U.S. 870, 873 n3 (1984).

13

step, the ALJ must determine the credibility of the claimant's statements based on consideration of the entire record, including medical signs and laboratory findings, the claimant's statements, and information provided by medical sources or other persons regarding the symptoms and how they affect the individual. SSR 96-7p, 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). The regulations further note that an individual's symptoms "can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone." 20 C.F.R. §§ 404.1529(c) and 416.929(c). In those circumstances, the ALJ must also consider the claimant's daily activities; the location, duration, frequency and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness and side effects of medication(s) the individual takes to alleviate the symptoms; treatment other than medication received to relieve pain, and any other factors concerning the individual's functional limitations and restrictions due to the symptoms. Id.

We begin with a brief review of the symptoms commonly associated with sarcoidosis.[11] According to the on-line medical

---

[11] Plaintiff does not offer any arguments regarding the pain which may have been associated with his torn rotator cuff, nor with the ALJ's analysis of his depression and anxiety. Therefore, the Court will focus on the subjective symptoms associated with sarcoidosis. Asymptomatic HIV infection is, by definition, characterized by the absence of symptoms associated with more advanced HIV, such as fevers, weight loss, oral thrush, or opportunistic infections. See www.nlm.nih.gov/medlineplus. However, because HIV destroys the immune system, other infections and symptoms may be intermittently present, e.g., sore throat, mouth sores, muscle

14

encyclopedia provided by the National Institutes of Health, such symptoms include general malaise, fatigue, fever, shortness of breath, cough, skin lesions or rash, headache, neurological changes, enlargement of the lymph glands, liver or spleen, and weight loss. See www.nlm.nih.gov/medlineplus.

On January 21, 2004, Dr. Riddler wrote the letter on behalf of Mr. Harvey to which the ALJ referred in his decision. In part, Dr. Riddler stated:

Mr. Harvey has been diagnosed with sarcoidosis after being hospitalized in February 2003 with chest pain. Over the past year, he has had substantial morbidity related to this disease including the following symptoms: fatigue, joint pain in hips, elbows, wrist and knees. The patient describes the pain as dull, but it causes him to awaken [from] sleep. Often times the patient[ ] feels as though his joints are "hot and burning." Furthermore, the patient experiences pleuritic chest pain, which is sharp and exacerbated by activity. Over the past year, Mr. Harvey has been unable to work due to incapacitating symptoms.

Also of concern, Mr. Harvey reports episodes of vertigo and memory lapses. The ongoing nature of these symptoms has result in the patient feeling depressed and fearful of physical activity.

(Tr. 8/397.)

With regard to this letter, the ALJ stated,

I give limited weight to the findings of Dr. Riddler. Dr. Riddler's treatment records (Exhibits 3F, 13F, 18F, 19F) do not support the opinion and it is contradicted by the assessment of the state agency that the claimant is capable of sedentary exertion. (Exhibit 9F.) The agency opinion is supported by the thorough rationale of a

---

stiffness or aching, headache, diarrhea, swollen lymph glands, fever, fatigue, and rashes of various types. Id.

medical doctor (Social Security Ruling 96-6p).

(Tr. 6/21.)

The Court finds this conclusion troubling for several reasons. First, Plaintiff's reports to his physicians regarding fatigue, pain, and mental impairments are consistent with the content of Dr. Riddler's letter. For instance, on January 12, 2004, Plaintiff was examined by Dr. Riddler for a routine check. Plaintiff's "problem list" as of that date included sarcoidosis, lung involvement, asymptomatic HIV infection, unspecified joint pain, rotator cuff syndrome, aftercare for long-term use of medication, calculus of kidney, anxiety of non-specific origin, agoraphobia with panic, depressive disorder and peripheral vertigo. (Tr. 8/310.)  In reply to subjective questions, Mr. Harvey had responded that his pain level since his last visit was 5 on a scale of 1 to 10; his appetite had changed from (apparently) normal to "weird;" and he was having trouble doing all his usual activities.  (Tr. 8/310-311.)  The doctor's notes include the following:

> 45 [year old] man with HIV, neuropathy,[12] and sarcoid
> here for [follow-up].  Having a lot of fatigue.  Joint
> pain in hips.  Pain occurs in hip joints at one time, at
> other times in other joints (elbows, wrists, knees).
> Worst in left hip followed by the right hip.  Pain is
> dull.  Can awaken from sleep – joints feel hot/burning.
> Pain like this for the past year.  Has tried Advil 800

---

[12]  Neuropathy is defined as an abnormal and usually degenerative state of the nervous system of nerves and also a systemic condition (as muscular atrophy) stemming from a neuropathy.  See dictionary at www.nlm.nih.gov/medlineplus.

16

mg. Has stopped neurontin[13] regularly – made him to
[sic] fatigued. Uses now when neuropathic pain
("electrocution" in legs) – takes neurontin for a few
days. Feels depressed because he feels so uncomfortable
he doesn't want to move.

(Tr. 8/311.)

In the physical examination, Dr. Riddler noted subjective
reports of fever, chills and sweats which had "been occurring
forever." Mr. Harvey had "some" sharp pleuritic chest pain which
was exacerbated by activity, "so on days that he feels pain, he
rests more." He also reported "constant nausea" but no vomiting,
and the pain from repeated kidney stones was not as severe as it
had been in the past. He told Dr. Riddler he was "having memory
lapses – can't remember details (e.g., how many pills to take of
crixivan or how to work microwave). Periodic episodes of vertigo."
His mood was described as depressed although he was seeing a
therapist regularly. He had been prescribed lexapro for
depression, but experienced serotonin syndrome.[14]

---

[13] Neurontin (gabapentin) is prescribed (among other purposes) to
relieve the burning, stabbing pain or aches following an attack of
shingles. Neurontin has numerous side effects, including drowsiness,
fatigue, dizziness, headache, unsteadiness, anxiety, memory problems,
and nausea. See drug descriptions at www.nlm.nih.gov/medlineplus.

[14] Lexapro (escitalopram) is used to treat depression and
generalized anxiety disorder. Escitalopram is one of several
selective serotonin re-uptake inhibitors which work by increasing
serotonin, a natural substance in the brain that helps maintain mental
balance. Serotonin syndrome is a potentially life-threatening
reaction occurring when the body has too much serotonin, most often
caused as the result of two drugs that affect the body's level of
serotonin being taken together at the same time. See dictionary and
drug descriptions at www.nlm.nih.gov/medlineplus.

17

Dr. Riddler ended her notes from the examination with the following statement:

> Patient continues to refuse to consider prednisone [to treat sarcoidosis] due to fear of immunosuppression despite numerous symptoms that are incapacitating and clearly impacting his quality of life.  Long discussion but no resolution.  Will continue to follow with Dr. Dauber.

(Tr. 8/312.)

A review of Dr. Riddler's total medical file shows repeated reports of fatigue, chest and joint pain which caused him to decrease his activities, shortness of breath when walking up an incline, vertigo, chronic coughs, and depressed mood. (See, e.g., Tr. 8/329, 8/348, 8/351, 8/354, 8/355, 8/375, 8/376, 9/401, 9/411, 9/427, 9/431.)  There is nothing in her notes from which the Court can conclude that Dr. Riddler at any time believed Mr. Harvey was exaggerating the extent of his symptoms or malingering.

As noted above, the ALJ rejected Dr. Riddler's opinion in favor of the assessment by a non-examining state agency physician. In an RFC evaluation form dated June 2, 2003, the state agency physician concluded Plaintiff was able to lift and/or carry 10 pounds occasionally and lift and/or carry less than 10 pounds frequently; could stand or walk less than 2 hours and sit for less than 6 hours in an 8-hour work day with the requirements of normal breaks and being able to alternate between sitting and standing;

had unlimited ability to push or pull with either arm;[15] and could occasionally climb, stoop and crouch but never balance, kneel or crawl.   While there were no manipulative, visual or communicative limitations, Plaintiff was to avoid even moderate exposure to fumes, odors, dusts, gases and poor ventilation.   (Tr. 8/234-243.)

It is unclear what medical records were reviewed in preparing this evaluation, but it seems unlikely that the examiner considered Plaintiff's diagnosis of sarcoidosis.   We arrive at this conclusion based on the following written exchange:

Question to medical staff:   Claimant with a long history of being HIV positive.   CD4 count is not severely abnormal.   Claimant has respiratory complications.   His activities of daily living seem markedly limited.   Would an RFC less than sedentary be appropriate?

Response: This individual's only current problem appears to be partial thickness rotator cuff tear.   His HIV positive status does not appear to be limiting in any way.   His [activities of daily living] form does not seem credible.   He complains of depression but has never been treated for that.[16]   His viral load is minimal.   I don't concur [??] that less than sedentary RFC is supported.

---

[15]   The agency physician also noted that Mr. Harvey could reach in all directions, including overhead.   (Tr. 8/249.)   This evaluation was made at the time Mr. Harvey was undergoing physical therapy for his rotator cuff problem and would continue to do so until November 2003. (See Tr. 8/281.)   It is unclear if the agency physician had records from the physical therapist from March through June 2003.

[16] Again, we question whether the agency physician had the full medical record since a letter from a physical therapist dated March 11, 2003, to Robert Goitz, the physician who was treating Plaintiff for the rotator cuff problem, concluded that the tear in the rotator cuff was full, not partial.   (Tr. 8/222.)   It is also clearly not correct that Mr. Harvey had "never been treated" for depression.   The record shows that he had been seeing a therapist since 1996, shortly after he was diagnosed with HIV. (Tr. 8/225-233, report of Richard Marshall dated June 18, 2003.)

19

(Tr. 8/242-243.)

The conclusion that Plaintiff's only "current problem" was the partially torn rotator cuff does not take into consideration the fact that Mr. Harvey had been hospitalized in mid-February 2003 for chest pain.   (Tr. 6/111-121.)   A preliminary diagnosis of sarcoidosis was made not later than March 24, 2003.   (Tr. 8/372.) Following a bronchoscopy and lung biopsy, the diagnosis was confirmed not later than May 1, 2003.   (Tr. 8/355.)   Thus, the Court is compelled to conclude that the state physician did not have the full medical record when the evaluation was completed. *See* Cadillac v. Barnhart, No. 03-2137, 2003 U.S. App. LEXIS 24888, *15-*16 (3d Cir. Dec. 10, 2003), holding that the ALJ erred by relying on state agency conclusions based on an incomplete record rather than on physicians' opinions based on later, more complete medical records, as well as a hands-on examination.

Moreover, although each page of the "check-the-box" RFC evaluation form indicates "see attached" when the state agency physician was asked to explain the evidence on which he based his conclusion or his reasoning, there is nothing in the record which provides this explanation.   We therefore cannot agree with the ALJ's conclusion that the RFC evaluation was "supported by the thorough rationale of a medical doctor."   (Tr. 6/21.)

We conclude the ALJ erred by failing to properly evaluate Plaintiff's subjective symptoms of pain and fatigue, supported by

20

the medical record and by Plaintiff's own testimony. Dr. Riddler was Plaintiff's long-term treating physician, as well as being a specialist in infectious disease. (See Tr. 8/279.) As such, her opinion that the symptoms associated with sarcoidosis were "incapacitating" is entitled to great, if not controlling, weight inasmuch as those opinions can be considered to reflect "expert judgment based on a continuing observation of the patient's condition over a prolonged time." Morales, 225 F.3d at 317; see also 20 C.F.R. § 416.927(d)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.") Second, her opinion is consistent with not only her own notes, but with the notes of Dr. James Dauber, a pulmonary specialist who treated Plaintiff for lung problems associated with sarcoidosis. (See, generally, Tr. 8/374-396.) For example, Dr. Dauber noted on May 1, 2003, Mr. Harvey's complaints of pleuritic chest pains, fatigue, joints "painful enough that he cannot walk long distances," and shortness of breath. (Tr. 8/355.) Even the physical therapist who was working to alleviate Plaintiff's rotator cuff problem noted on October 1, 2003, his reports of joint pain, "achyness," nausea and fatigue. (Tr. 8/283.) In short, the only evidence in the record which contradicts Dr. Riddler's report of "incapacitating" fatigue and joint pain is the assessment of the non-examining state physician.

21

It is true, as the ALJ noted, that Plaintiff sometimes had periods of decreased pain. *See*, e.g., Tr. 8/348, which notes in July 2003 "several days" with "minimal pain," but also the comment that "he has discovered that [left] chest pain will resolve very quickly if he lays [sic] down as soon as it starts." His fatigue at that point was described as "still substantial" with the comment that "he has the time to sleep in the day which helps." (Id.) In September 2004, Mr. Harvey reported that his chest pain episodes and "electric" sensations in his legs were "less frequent," but that he remained "very fatigued" with persistent diffuse pains in wrist and elbow joints. (Tr. 9/411.) In November 2004, shortly after the hearing before the ALJ, Mr. Harvey reported to Dr. Riddler that he was having "more good days than bad," with "less joint pain and coughing spells." (Tr. 9/401.)

Periods of relatively less pain or fatigue do not indicate that the reduced levels are such that the claimant can perform substantial gainful activity on a day-in, day-out basis. Social Security Ruling 96-9 defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule." *See also* 20 C.F.R. § 416.945. We also note that Plaintiff's non-medication methods for dealing with his symptoms, i.e., lying down to alleviate chest pain or sleeping when he is substantially fatigued, would be precluded by the normal

22

requirements of regular employment.

In arriving at his decision regarding the effect of Plaintiff's pain and fatigue, the ALJ appropriately considered Mr. Harvey's self-reported activities of daily living ("ADL.") He particularly noted an ability to do some housework and the laundry, prepare simple meals, care for his personal needs, and grocery shop. (Tr. 6/23, *citing* Exhibit 4E and testimony.) However, a more balanced review of the ADL questionnaire shows that while Plaintiff did accomplish these tasks, almost all of his statements include limitations, e.g., doing grocery shopping "on a good day," wearing the same clothes two or more days to cut down on laundry, or dressing "in steps" to accommodate pain and fatigue. He also notes that he has given up nearly all sports, social and family activities, any heavy or repetitive domestic chores (e.g., home repairs and vacuuming), and that all activities take longer to accomplish. (Tr. 6/82-92.)

Mr. Harvey testified that his daily activities depend "on the quality of my day. . . . And every day I try to have something that I do so that I have a sense of accomplishment. . . . I try to do at least a load of laundry." (Tr. 9/486.) "On good days, I try to get done as much as possible, clean up the house, try to pick little projects around the house to do." (Tr. 9/487.)

Plaintiff's testimony and statements in the ADL questionnaire are consistent with his reports of varying intensity of pain and

23

fatigue.  Sporadic or transitory activity such as shopping for the necessities of life does not disprove the inability to maintain substantial gainful employment.  *See* Smith v. Califano, 637 F.2d 968, 971-972 (3d Cir. 1981).  The law does not require a complete restriction from recreational and other activities as a prerequisite to a finding of disability.  Smith, id. at 971. ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity.")

The ALJ also noted that "the record does not show serious side effects from his medications," which Social Security regulations also require the ALJ to consider in ascertaining the effects of subjective complaints.  Again, we find this conclusion is not supported by substantial medical evidence of record.

At the hearing, Plaintiff provided a list of his current medications and their side effects.  At that time, he was taking five medications daily and another five "as needed."  (Tr. 6/109.) Side effects from those drugs included sickness after his morning medications for one to three hours, after his afternoon medications for one to two hours, and after his evening medications for 30 minutes to an hour.  He also experienced "bouts of explosive diarrhea," sleepiness, dizziness, feelings of panic, anxiety or fear, lightheadedness, "head pounding," hot flashes, and sensitivity to noise.  (Id.)  This report is consistent with his reports to his physicians of morning nausea (Tr. 8/329) and fatigue

24

to the point he "barely can get out of bed in the morning." Dr.
Dauber attributed this level of fatigue, at least "in some part,"
to use of antivert[17] and antihistamines. Dr. Dauber also commented
on Plaintiff's peripheral neuropathy, "probably drug induced" from
his treatment with neurontin. (Tr. 8/376). His medical record also
noted allergic reactions to vicodin (hydrocordone) which caused
vomiting and to escitalopram which resulted in serotonin syndrome
as discussed above in note 14. (Tr. 9/412.)

   Plaintiff testified at the hearing that on that particular
day, he had experienced nausea for 30 minutes after taking his
morning medications. (Tr. 9/486.) The ALJ commented that "the
claimant reported being sick for 3 hours after taking his
medications, but this is not corroborated in the record." (Tr.
6/23.) A more careful review of the medications list provided by
Plaintiff, his testimony, and medical reports show that not only
does this conclusion mischaracterize the period of nausea after
taking medications, but ignores the other side effects listed
above.   The ALJ also failed to note that although Mr. Harvey
reported to his physicians that the burning pains in his legs were
improved by using neurotin, he limited his use of that drug because
of neuropathy and fatigue. (Tr. 8/311.)

   ----

   [17]   Antivert (meclizine), used to prevent and treat nausea,
vomiting, and dizziness, was prescribed in November 2003 when Mr.
Harvey was hospitalized after he developed vertigo.   *See* drug
descriptions at www.nlm.nih.gov/medlineplus.   Dr. Dauber noted on
December 4, 2003, that antivert produced some improvement but
Plaintiff was still experiencing dizziness.   (Tr. 8/376.)

We recognize that conclusions regarding the extent and effect of subjective complaints are largely a matter of credibility determination by the ALJ.  As such, they are entitled to great deference and should not be discarded lightly, given his opportunity to observe the claimant's demeanor.  <u>Reefer v. Barnhart</u>, 326 F.3d 376, 380 (3d Cir. 2003).  However, the ALJ is required to give significant weight to a claimant's subjective complaints and alleged functional limitations when those allegations are supported by competent medical evidence.  <u>Schaudeck v. Commissioner of Soc. Sec.</u>, 181 F.3d 429, 433 (3d Cir. 1999).  Once evidence of an underlying medical impairment is introduced, as is the case here, the ALJ may not discredit the claimant's testimony as to the severity of symptoms simply because there is no objective medical evidence to support that testimony.  See SSR 96-7, stating that "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."  Subjective complaints are to be given "great weight" unless there is conflicting medical evidence (see <u>Mason</u>, 994 F.2d at 1067-68), but no conflicting evidence exists in the record here except the conclusory report of a non-examining physician who appears not to have considered all of Plaintiff's impairments.  See SSR 96-6p, noting that opinions of state agency consultants can be

26

given weight only insofar as they are supported by evidence in the case record, considering, e.g., the consistency of the opinion with the record as a whole.

In sum, we conclude that the ALJ erred in his determination that Plaintiff retained the RFC to perform a limited range of sedentary work inasmuch as that decision was based only on the report of the non-examining state agency physician which in turn appears to have been based on an incomplete medical record.   In light of contradictory medical evidence, chiefly the opinions of Drs. Dauber and Riddler, together with Plaintiff's subjective complaints of chronic pain and fatigue, the state agency RFC evaluation cannot be considered substantial evidence.

3.      *The ALJ's finding that Plaintiff's residual functional capacity allowed him to perform a modified range of sedentary work:* Finally, Plaintiff argues that there is no substantial evidence to support the ALJ's conclusion that Mr. Harvey was capable of performing a modified range of sedentary work.   That is, the ALJ erred by rejecting the vocational expert's answers to hypothetical questions which incorporated evidence of incapacitating fatigue and pain, plus the side effects of medications. (Plf.'s Brief at 25.)

At the hearing, the ALJ asked the vocational expert three hypothetical questions. The first asked the VE to

assume an individual of the Claimant's age, education level and past work experience who has the following

27

> limitations.  The maximum lifting is ten pounds, repeated
> maximum lifting is five pounds.  Stand two hours out of
> an eight-hour day, sit six hours out of an eight-hour
> day, walk two hours out of an eight-hour day.  However,
> individual should only occasionally stoop, crouch, or
> climb and should never be called upon to kneel, crawl, or
> balance.   Individual should avoid exposure to fumes,
> odors, and gasses, dust, and areas with poor ventilation.

(Tr. 9/497.)

The VE testified that such a person could return to his past relevant work as a designer, but not as a landscaper.  (Tr 9/497.)

The second hypothetical added to the above limitations a requirement that the individual work "in a low-stress environment" which the ALJ further defined "as requiring few decisions to be made."  (Tr. 9/497-498.)  The vocational expert testified that past work as a designer would be precluded with that additional limitation.  (Tr. 9/498.)

The third hypothetical asked the VE to assume that in addition to the above limitations, the individual "experiences difficulty with medications and will become ill after both morning and afternoon medication doses.  This could last from thirty minutes to three hours during which time this individual would be off task."  (Tr. 9/498.)  The VE testified that such a person could not work full time.  (Tr. 9/499.)

In response to a follow-up question by Plaintiff's counsel, the VE also testified that an individual who missed five to six days of work each month because of recurrent illnesses or recurrent side effects from medication for those illness would not be able to

28

routinely perform the jobs previously identified, i.e., information
clerk, mailing list compiler, or invoice clerk. (Tr. 9/499.)

"If . . . an ALJ poses a hypothetical question to a vocational
expert that fails to reflect 'all of the claimant's impairments
that are supported by the record[,] . . . it cannot be considered
substantial evidence.'" Ramirez v. Barnhart, 372 F.3d 546, 550 (3d
Cir. 2004), quoting Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d
Cir. 1987). Because we have concluded above that the ALJ erred in
his conclusions regarding the extent and effect of Plaintiff's
fatigue and pain, it follows that a hypothetical question which
does not take those impairments into account cannot be considered
substantial evidence.

We conclude, therefore, that the hypothetical on which the ALJ
depended was flawed and cannot form the basis of a decision denying
benefits to Mr. Harvey. However, the third hypothetical question
which included the effects of medication and the hypothetical
question posed by Plaintiff's counsel were both answered by the
vocational expert to the effect that such a person could not
perform substantial gainful employment.

## V.    FURTHER PROCEEDINGS

Under 42 U.S.C. § 405(g), a district court may, at its
discretion, affirm, modify or reverse the Commissioner's final
decision with or without remand for additional hearings. However,
the   reviewing   court   may   award   benefits   "only   when   the

administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the plaintiff is disabled and entitled to benefits." Krizon v. Barnhart, 197 F. Supp.2d 279, 291 (W.D. Pa. 2002), *quoting* Podedworney v. Harris, 745 F.2d 210, 222 (3d Cir. 1984).

We conclude that this is one of those rare instances in which benefits may be awarded without further development of the record. There is no substantial evidence to refute Plaintiff's testimony and his physicians' reports of chronic incapacitating fatigue and pain. In response to hypothetical questions which incorporated those limitations, the vocational expert testified that such a person would be unable to maintain substantial gainful employment. We therefore reverse the Commissioner's final decision and remand this case for the limited purpose of determining when Mr. Harvey became disabled as the result of the effects of his sarcoidosis and for calculating supplemental security insurance and disability insurance benefits to Plaintiff commencing as that date. An appropriate order follows.

December _/9_, 2006

William L. Standish
United States District Judge

cc:  John C. Burt, Esq.
     401 Wood Street
     Suite 810, Arrott Building
     Pittsburgh, PA 15222
     Email: jburt@nidhog.com

30

Megan Farrell, Esq.
United States Attorney's Office
700 Grant Street
Suite 4000
Pittsburgh, PA 15219
Email: megan.farrell@usdoj.gov